15003.   KENNEY *v.* HIGGINS *et al.*

The evidence being in conflict upon material issues, and presenting questions for determination by the jury, the court erred in directing a verdict.

DECIDED JANUARY 15, 1924. ADHERED TO ON REHEARING, FEBRUARY 25, 1924.

Complaint; from city court of Savannah—Judge Freeman. July 30, 1923.

Certiorari was granted by the Supreme Court.

*Travis & Travis*, for plaintiff in error.

*McIntire, Walsh & Bernstein*, contra.

LUKE, J.   This case was commenced as a suit for the recovery of $300 earnest money paid on the purchase price of real property, the plaintiffs alleging that, because of the seller's fault, the sale was not completed. Annexed to their petition is a copy of the written contract in question, which is referred to in the evidence as a "sales ticket," and which is in words and figures as follows: "Savannah, Ga., May 10th, 1921. I have this day sold, subject to the existing leases thereon, as broker for myself, to Mrs. Helen Higgins and Mrs. J. P. Miller, for the sum of seven thousand dollars, the following property: 124-126 Waldburg Street E., being that two-and-a-half-story frame dwelling located on the northerly side of Waldburg St., about thirty feet west of the northwest corner of Abercorn St. The terms of sale are as follows: Cash. The property is sold with the same reservations as con-

tained in sales ticket to seller. Title to premises to be merchant-able. Conveyance by seller is to be by warranty deed. Taxes, water rents, rents, and insurance are to be prorated between the parties as of date of the passing of the title, which is to take place within July 1st, 1921. Time shall be of the essence of this con-tract, and earnest money may be retained in case of breach by purchaser. Sum of three hundred dollars has been paid on account of purchase price; same to be returned if titles to premises are not merchantable. Frank J. Kenney, Broker. Accepted: Mrs. Helen Higgins, Mrs. J. P. Miller."

In their petition the plaintiffs allege the making of the contract, the payment of the earnest money as therein recited, their own ability, readiness, and willingness to complete the purchase in accordance with the terms of the contract, and the defendant's refusal so to do. Plaintiffs further allege that defendant never owned or acquired any title to the property in question, so as to be able to comply with his obligations; that for several days prior to July 1, 1921, during the last days of the life of the contract, the defendant was on a drunken spree, unable to attend to any business, and so absented and concealed himself that they were unable to find him, tender the balance of the purchase price, or personally demand the conveyance; and that these things, rather than any express declaration on his part, constitute the defendant's refusal to abide by his obligations under the said contract. It is further alleged that, after the contract had been so breached by the defend-ant and had lapsed, they made demand upon him for a return of the $300 earnest money and he refused to pay it. They prayed judgment against him for $300, with interest thereon at the rate of 7% per annum from July 1, 1921. In his answer the defendant admitted making the contract and receiving the $300 earnest money, but denied the remainder of the petition.

Upon the trial the plaintiffs introduced evidence sufficient to make out their case prima facie as laid in the petition. With this statement, a further outline of their evidence here could serve no valid purpose. The defendant introduced in evidence another contract, or "sales ticket," evidently written upon one of the same printed forms as the contract in suit, and which differed from it in the following parts only: "Savannah, Ga., May 9th, 1921. I have this day sold, subject to the existing leases thereon, as

broker for G. Brown, to A. F. Breckwoldt, for the sum of fourteen thousand dollars, the following property, being those two frame dwellings located at the northwest corner of Abercorn and Waldburg Streets in the city of Savannah, and being numbered 124, 126, 128, and 130 Waldburg St., East, said city. The lot having a frontage of about 60 ft. on Waldburg St., and a depth of about 55 ft. on Abercorn St. Reference is hereby made to deed to seller for better description of same. Subject to the reservations contained in deeds from Jacob E. Tussey to A. L. Harwood and Francis H. Gibbs, dated January 15, 1905. The terms of the sale are as follows: Cash. The seller or his daughter, Mrs. Ida Blumberg, is to have a lease of the upper apartment at 128 Waldburg St., East, for $40.00 a month for one year, commencing October 1st, 1921. . . Sum of two hundred dollars has been paid on account of purchase price; same to be returned if titles to premises are not merchantable. The seller is to pay my commission of $500.00. Frank J. Kenney, Broker. Accepted: G. Brown. A. F. Breckwoldt."

The defendant testified: that this contract was transferred to him by Breckwoldt; that upon plaintiffs learning that he held it they wanted to buy an interest in it; that he bought it for the purpose of speculation, and they wanted an interest in it for the same purpose; that, prior to this transaction, they had taken similar "sales tickets" from him as to other property, had listed the property with him for resale, and in each instance he had sold the property at a profit to plaintiffs, this transaction being the first of their speculations to prove unprofitable. In the brief of evidence here his testimony appears in part in the following language: "They would drop into my office from time to time to inquire, and finally, in the late spring of 1921, I heard of these two houses or apartments on Waldburg Street, owned by Mr. Brown, who was just on the stand. I closed the deal with them at $14,000, and signed the sales ticket—had the sales ticket drawn at $14,000. Mrs. Miller and Mrs. Higgins happened to drop in my office, I think, the next day. I told them about getting the sales ticket on this property, and they asked if I would let them have one of the houses. . . After some discussion I agreed to let them in on it. . . They paid a deposit of $300. I in the meantime had paid a deposit on the other. I gave them a sales ticket at $7000. They immediately set a price on the property of $8500, to try to

make a profit of $1500. I told them the price was a little steep; however, I would work on it. They had, as I recall, 45 or 60 days on the sales ticket,—I forget which. But in a few days we found we could not sell it at that price, and the sales ticket was about to run out. In the meantime I had arranged to handle my part. I had retained the corner house. I had some money in the bank to pay my portion of it, and I had arranged to borrow $5000 on the corner. I had hopes of arranging for them to get $2000. I told them, ' You realize if you don't get the money before the sales ticket expires, you lose the $300 ?' They said, ' The $300 we hate to lose, but we haven't got the money;' and then they instructed me to sell the sales ticket for $500 profit. The time was short and only a few days before the sales ticket would run out. I couldn't sell it for the $500 increase, and the result was that the sale fell through and both deposits were lost. The ladies came to my office a number of times after that, still looking for another speculation to get their money back. Things moved along, and no demand was made for the money. No letter was ever written to me, asking for the money. This thing dragged along for nearly a year; then Mrs. Kenney and Mrs. Higgins had a little altercation. I don't know the details of it, but in any event the next thing I knew I was notified that the ladies had put their claim in the hands of Mr. Walsh to collect this $300 deposit. . . In regard to my being away from my office and under the influence of liquor: I was not continually on a spree. I was drinking at the time. I was arrested twice for driving an automobile when under the influence of liquor, but I was at my office practically all the time. The ladies saw me at the office only a few days before the sales ticket ran out, and at that time they authorized me to sell it at $7500, or $500 profit. . . These ladies have never told me that they were ready to come across with the $7000. They told me that they were not able to raise $2000. That was between the 10th and 15th of June, 1921, along the middle of the month. They were not in my office every day—practically every day. I was not in a dreadful condition about that time. . . I was prepared to close out my part of the transaction. . . I was to pay $13,500 for the whole thing and sell the ladies the inside half for $7000. I was ready and willing to close my end of the transaction upon their paying this $7000. I had more than $7000, as my bank statement will show."

The court directed a verdict in favor of the plaintiff, but, as the case was being tried by a jury, we think that, under all the evidence as above indicated, it was within their province, and within their province alone, to say on which side of the case the truth lay. If, as contended by the plaintiffs, they really and in good faith endeavored to complete the purchase contemplated by their contract, and were ready, willing, and able to do so, and were prevented from so doing solely by reason of the defendant's fault in purposely absenting or concealing himself from them, or in failing to acquire a merchantable title to the property he was to convey, then they are entitled to recover. But if, as contended by the defendant, the failure to complete the purchase and sale in question was caused, not by reason of any breach of the contract on his part, but by reason of the plaintiffs' inability to pay at the time for performance, or because they could not or would not pay the purchase price, or if, without fault on his part, they failed to notify him during the time for performance that they were in fact ready, willing, and able to complete the sale in accordance with the terms of the contract, then the plaintiffs are not entitled to recover. The mere fact, if it is a fact, that plaintiffs undertook to sell their contract during the time for performance, would not, of itself alone, deprive them of their contractual right to perform it themselves after having failed to sell it. Evidence as to that matter is relevant only in so far as it may help the jury to arrive at the real truth of the case touching the material issues in the case. The same principle applies with equal force to the defendant's unsuccessful attempt to sell the other half of his contract with Brown, the real owner of the property. All parties had, as a matter of law, the unquestioned right to sell, or offer for sale, whatever interest they owned in the property, as well as the right to acquire a greater interest therein for the sole purpose of reselling the same at a profit.

The plaintiffs would now lay great stress upon the uncontradicted fact that the defendant never owned or acquired a merchantable title to the property he contracted to sell to them, insisting that the case is analogous to one in which the seller executes a bond for title and takes the purchaser's promissory notes for the unpaid part of the purchase price. The two cases are not, however, analogous. Under all the facts of the instant case, the only issue

as to this point is as above stated. In so far as the defendant's lack of title affected or controlled the conduct of the plaintiffs at the time of the transaction, it should affect or control the outcome of this case upon the trial, but no further than that. Cases should never turn on mere afterthought, nor should a party's proper forethought ever be unavailing; but which is which, under the conflicting evidence in this case, is a question for the jury, and not for the court. Let them answer by their verdict upon the next trial.

*Judgment reversed. Bloodworth, J., concurs. Broyles, C. J. dissents.*